UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THREE BROTHERS TRADING, LLC, d/b/a ALTERNATIVE EXECUTION GROUP,<br><br>Petitioner,<br><br>v.<br><br>GENEREX BIOTECHNOLOGY CORP.<br><br>Respondent. | Civil Action No. 18-CV-11585 (KPF)<br><br>**DECLARATION OF RICHARD ALTER IN SUPPORT OF AEXG'S APPLICATION FOR THE APPOINTMENT OF A RECEIVER** |

I, RICHARD ALTER, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a member of Three Brothers Trading, LLC, d/b/a AEXG ("AEXG"), a limited liability company under the laws of New York and the judgment creditor in this action. I make this declaration based on my own personal knowledge and belief any my review of the documents relevant to this matter.

2.  I respectfully submit this declaration in support of AEXG's application seeking (1) pursuant to Fed. R. Civ. P. 66, 69 and CPLR 5228, inter alia, the appointment of a receiver to take immediate possession and control of the assets of the judgment debtor Generex Biotechnology Corp. ("Generex"), including, without limitation, its accounts, intellectual property, and books and records, as well as its equity interests in its subsidiaries, and (2) attorney's fees related to the instant motion and prior enforcement efforts.

## Statement of Facts

**Collection Efforts And Negotiations**

3.  As the Court knows, on April 9, 2021, with Generex's consent, this Court directed the entry of a money judgment in AEXG's favor against Generex for the sum of approximately

$4.6 million (the "Judgment"). The parties intended that Generex would effectuate an initial public offering of its majority-owned subsidiary, NuGenerex Immuno-Oncology, Inc., and that Generex would use part of the proceeds of this, the "NuGenerex IPO", to satisfy the Judgment.

4. On June 8, 2021, AEXG's counsel wrote to Generex's then-counsel, Mr. Alexander Klein, inquiring whether the NuGenerex IPO would occur before June 15, 2021 and whether, in the alternative, Generex intended to pay the Judgment. Mr. Klein responded that Generex was "trying." A true and correct copy of this correspondence is attached hereto as Exhibit A. To date, NuGenerex IPO has not occurred. Per subsequent discussions with Generex's counsel, the non-occurrence is attributed to an SEC inquiry into Generex that goes back to December 2020 but was never disclosed to AEXG.

5. On June 14, 2021, I spoke by telephone with Generex's CEO, Mr. Joseph Moscato, who, *inter alia*, agreed to (a) pay AEXG weekly installment payments in the amount of $50,000.00 toward satisfaction of the Judgment, and (b) provide fulsome voluntary disclosure of Generex's financial circumstances in exchange of continued forbearance on certain enforcement steps. Generex made an installment payment, but did not provide any disclosure.

6. On June 15, 2021, AEXG served certain information subpoenas, but, as a gesture of good faith toward Generex's partial compliance, refrained from sending restraining notices. A true and correct copy of Mr. Dunefsky's June 15, 2021 email alerting Mr. Moscato to the foregoing is attached hereto as Exhibit B. Exhibit B also captures Mr. Moscato's June 15, 2021 response, which did not deny the nature of the oral agreement and instead offered to provide disclosure.

7. The next day, however, Generex and Mr. Moscato changed their tune, with Mr. Moscato beginning what would prove to be a consistent practice of sending rambling and abuse-filled emails to AEXG and its counsel, asserting that AEXG's very enforcement efforts would

01086756.1
4867-5608-8066, v. 1

2

bankrupt the company (in Mr. Moscato's words, it would "go dormant and bye bye") and referring to AEXG's enforcement efforts, that he had consented to the prior day, as "ridiculous" and "disgusting". A true and correct copy of this email chain attached hereto as Exhibit C.

8. Despite this, AEXG continued to work with professionals representing Generex toward a resolution for the next several weeks, with meetings involving AEXG's counsel occurring, for example, on June 17, 2021, June 18, 2021, June 24, 2021, and June 30, 2021.

9. On June 23, 2021 and June 30, 2021, notwithstanding the foregoing, Generex made two additional installment payments in the amount of $50,000 each toward satisfaction of the Judgment.

10. Also on June 30, 2021, Generex made an initial response to AEXG's information subpoena through its counsel Barket Epstein. A true and correct copy of this response is attached hereto as Exhibit D. Exhibit D notably discloses Generex owing purported $25 million to its own subsidiaries, third-party debt of $6.8 million, accrued salary and fees owed to Generex directors and officers of $10.7 million, and, most remarkably, contains the claim that Generex owes the "Friends of Generex Trust" (the "Trust") $82 million. Per Generex's SEC filings, the Trust is controlled by Mr. Moscato. The disclosure identified approximately $260 in cash assets for Generex and under $200,000 in cash assets for Generex's subsidiaries. However, it also identified over $168 million in "book value" of Generex's investments.

11. On July 7, 2021, Generex supplemented its subpoena response through its new counsel Tarter Krinsky. A true and correct copy of this supplemental response is attached hereto as Exhibit E. Exhibit E increased the amount owed to officers and directors to $11.4 million and added an exhibit of funds Generex owed in accounts receivable to various vendors ($2.6 million),

including funds owed to its various attorneys and other professionals, over $2.1 million of which was over 90 days overdue.

12. On July 15, 2021, Generex's independent auditor, Mazars USA, responded to AEXG's information subpoena. A true and correct copy of that response is attached hereto as Exhibit F. Exhibit F partially accords with, and partially differs from Exhibits D and E, identifying only $10.2 million in total debt other than the Judgment, and, significantly, showing no awareness of the supposed $25 million owed to subsidiaries or $82 million owed to a trust controlled by Generex's CEO.

13. AEXG did not know, and was not in a position to know, the validity of these purported debts. As such, it began to press for further documentation of Generex's financial situation in negotiations.

14. Generex has made no further $50,000 installment payments towards satisfaction of the judgment since June 30, 2021.

15. On July 21, 2021, Generex filed an 8K reflecting that it had raised approximately $1 million.

16. AEXG's counsel noted this capital raise, and Generex's failure to make three installment payments, in a July 22, 2021 teleconference with Mr. Robert Heim of Tarter Krinsky. As memorialized in an email AEXG's counsel sent Mr. Heim the next day, a true and correct copy of which is attached hereto as Exhibit G, AEXG made a renewed demand for the $50,000 payments, asking for $100,000 to be paid immediately (less than the $150,000 owed for three skipped weeks).

17. On July 26, 2021, Mr. Moscato emailed AEXG's counsel, cc'ing his counsel, claiming not to have $100,000, but offering to pay AEXG $50,000 and stating (between further

abusive language) that Generex's patents would soon expire, that its subsidiaries would flee, and that the company would soon go dark.

18. On July 29, 2021, AEXG's counsel responded to Generex's counsel, highlighting the tension between Generex's claim to have no funds and the recent capital raise, the lack of explanation as to how $1 million had vanished in less than a week without AEXG seeing a penny, Generex's failure to identify patents as assets in Exhibits D or E, and the conflicts between Exhibits D and E and Exhibit F, as well as Generex's other failures to document its claims. This email concluded by noting that AEXG expected prompt payment or it would serve a restraining notice freezing Generex's funds. A true and correct copy of this correspondence is attached hereto as Exhibit H.

19. On July 30, 2021, Mr. Moscato emailed AEXG's counsel again, cc'ing his counsel, with further abusive language, now paired with an unsubstantiated claim that AEXG was conspiring against Generex with other creditors and a general refusal to provide disclosure or documentation. A true and correct copy of this correspondence is attached hereto as Exhibit I.

20. In a back-and-forth exchange between August 4-5, 2021, Mr. Heim, for Generex, offered to provide a breakdown of how Generex had spent the $1 million it had raised in July if AEXG would execute an NDA but claimed that it was impossible to make the $100,000 payment and, without a settlement with AEXG, Generex would "go dark and be transferred to the pink sheets". AEXG's counsel responded that Generex had, without even providing a warning, ceased its weekly $50,000 payments at the end of June and without the agreed upon interim payments, AEXG would be forced to serve a restraining notice. A true and correct copy of this correspondence is attached hereto as Exhibit J.

21. On August 5, 2021, AEXG served Generex with a restraining notice. A true and correct copy of the same is attached hereto as Exhibit K. Shortly after service, Mr. Heim contacted AEXG's counsel requesting a teleconference to attempt to resolve the matter, saying that Generex would be forced to disclose the restraining notice via an 8K disclosure within "a few days." A true and correct copy of this correspondence is attached hereto as Exhibit L. This was the first of several claims by Generex that it was required by the securities laws to disclose the restraining notice – as of the date of this motion, Generex has still made no such disclosure, indicating to AEXG that either Generex intentionally misrepresented its understanding of its obligations under the securities laws in an effort to gain a negotiating advantage, or, worse, flouted the securities laws.

22. The non-disclosure agreement (NDA) was executed on August 6, 2021 despite the foregoing. A true and correct copy of the NDA is attached hereto as Exhibit M: the Court will note it expressly provides that confidential materials can be disclosed in court filings associated with enforcement efforts.

23. Following execution of the NDA, Generex disclosed that: (a) it had paid over $382,000 from the July capital raise to a vendor, the PolyPeptide Group ("PolyPeptide"), that had conducted testing relevant to the "Investigational New Drug Application" (the "IND"), a necessary prerequisite, per Generex, to the NuGenerex IPO, in an effort to get it to release said test results; (b) PolyPeptide had not agreed to release the results on receipt of such payment and in fact had not done so, as Generex still owes PolyPeptide at least another $207,000, meaning that this payment simply diluted Generex's assets to no advantage; (c) Generex had spent $240,000 of the capital raise paying its own officers and directors (plus one ordinary employee), including Mr. Moscato, another $100,000 to the entity the CFO Squad, which employs Mr. Mark Corrao, who

was at the time serving as Generex's chief financial officer (and who was among the recipients of direct payments as well), and another $23,000 to Generex subsidiaries; and (d) Generex had spent much of the remaining funds paying its lawyers and other professionals, including paying the firms negotiating with AEXG. While Generex's July capital raise had been disclosed via 8K on July 21, 2021, over $700,000 of the $1 million raise had been spent by July 16, 2021, immediately, and without notice to AEXG. True and correct copies of the documents disclosing this information are attached hereto, collectively, as Exhibit N.

24. On August 9, 2021, AEXG responded to this disclosure, and began with a notification that Generex's prior disclosures had not identified the approximately $600,000 debt to PolyPeptide or many of the other recipients of the cash disbursed by Generex in July, and that Generex's continued misrepresentations were a stumbling block to settlement. Mr. Heim responded to the August 9 correspondence that Generex had unilaterally decided that its accounts payable are not debt and, therefore, were not responsive to AEXG's subpoena. His email also conveyed Generex's representation that it would shortly file an 8K and demand for the immediate withdrawal of the restraining notice, which it said would allow Generex to move forward with the IND within weeks, after which all would be well. AEXG's counsel responded, noting that Generex's insiders and professionals had pocketed some $425,000 in July that could have made PolyPeptide whole and allowed the IND to proceed, and that, if it was indeed only a matter of weeks, credit should have been advanced by those persons, not by AEXG. A true and correct copy of this correspondence, which continued onto August 10, 2021, is attached hereto as Exhibit O.

25. On August 10, 2021 and into August 11, 2021, Mr. Moscato sent a large number of emails to AEXG via its counsel and to other entities – to the effect that Generex going out of business and that the fallout would be catastrophic for AEXG but beneficial for him and other

insiders to Generex.  True and correct copies of these emails are attached hereto as Exhibit P.  Exhibit P contains express representations that Generex "cannot operate any longer", that Mr. Moscato was "putting in [his] resignation", that Generex was "done negotiating", that Generex's insiders were "owed big money", that Generex had "zero way to pay", and that the Judgment had "put [Generex] out of business", as well as Mr. Moscato's statement that an 8K had to be immediately filed because Generex's situation was "severe" and "material."  A recurrent theme of Exhibit P is Mr. Moscato's claim to be owed over $80 million, in an apparent reference to the Trust.  Exhibit P is also littered with Mr. Moscato's customary abusive language.

26. Despite the many directives in Exhibit P, Generex did not file an 8K on August 12, 2021 or on any subsequent day.

27. On August 25, 2021, Mr. Moscato cc'd AEXG's counsel on an email to Mr. Heim, directing that NuGenerex default in another litigation so as to increase the number of creditors and amount owed by Generex.  In a later email sent the same day, Mr. Moscato confirmed that he was operating Generex to penalize AEXG and its counsel, whom he referred to as "scum", seeking to add "50 million in losses to the pot", while again boasting that he personally was owed "86 million" and that other Generex insiders were owed "10s of millions" as well.  Mr. Moscato's email openly stated that AEXG would have to go "to stand on line with all the creditors, with me being the biggest."  In a third email sent the same day, Mr. Moscato stated that AEXG had defrauded Generex and that it and its counsel are "conn men" [sic].  A true and correct copy of this correspondence is attached hereto as Exhibit Q.  AEXG interprets this correspondence, and the Court should as well, to be an express statement that Generex intentionally arranged its affairs to prevent AEXG from collecting.

28. On the same day, Mr. Heim, Generex's counsel, conveyed a new settlement offer based on a proposed deal between Generex and the merchant bank Brooks Houghton that would allow Generex to monetize a medical product, Excellagen, that Generex owns through its wholly-owned New York-based subsidiary Olaregen Therapeutics, Inc. Mr. Heim's email expressly represented that Generex and Brooks Houghton had a "term sheet that was recently signed." Given prior misrepresentations, AEXG requested a copy of this term sheet. On August 26, 2021, Mr. Heim responded that Generex required Brooks Houghton's permission to share the term sheet. In subsequent correspondence, Mr. Heim repeatedly represented that Generex was awaiting approval to release the term sheet before finally claiming that there had been a "miscommunication" and that there had never been a term sheet – which AEXG later confirmed with Brooks Houghton directly. A true and correct copy of the emails addressing this issue is attached hereto as Exhibit R.

29. In one of the emails included in Exhibit R, dated September 1, 2021, Mr. Heim alerted AEXG that Generex's situation was "dire", that immediate steps had to be taken to preserve the company's value, and offering to satisfy the Judgment with the proceeds of the sale of one of Generex's subsidiaries.

30. On the September 7, Mr. Moscato emailed Mr. Heim, cc'ing AEXG's counsel, stating Generex owed unpayable back taxes, was losing its office space, and was now "I fixable" [sic -- presumably "unfixable"] and that "the fat lady has sung". Mr. Moscato also represented that Generex had abandoned its office space in Miramar, Florida. A true and correct copy of this correspondence is attached hereto as Exhibit S. AEXG's requests that Generex substantiate the possible sale of its subsidiary went unanswered.

31. On September 13, 2021, Generex asked that AEXG lift the restraining notice to permit Generex to pay its email hosting vendor $16,701, saying that otherwise Generex's valuable data would be lost. AEXG's counsel contacted the vendor, determined that Generex had simply made zero payments to this vendor since 2018, and asked if data could be preserved more cheaply than by paying the full balance: the answer, of course, was yes. AEXG continues to liaise with this vendor to preserve Generex's data. This event demonstrates Generex's continued failure to act as a steward of its remaining assets. True and correct copies of the relevant correspondence at attached hereto as Exhibit T.

32. In addition, Generex's counsel, Mr. Heim indicated on September 9, 2021, that given the restraining notice and unlikelihood that he will be paid, he has "limited ability to continue working on these negotiations" and, later the same afternoon, that further negotiation would not be fruitful as "their auditor and CFO Squad have resigned and they are no longer operational." True and correct copies of the relevant correspondence at attached hereto as Exhibit U.

33. In sum, according to the correspondence from Generex' CEO and counsel, Generex cannot pay or raise either the settlement agreement or even partial monthly payments to AEXG. It also cannot meet their SEC obligations, has lost its CFO and other key staff, its auditor, its office space, and will have its email service turned off imminently. Mr. Moscato on numerous occasions indicated that Generex is no longer operational and in a September 16, 2021 email to his counsel Mr. Heim (on which AEXG's counsel was cc'd) directed the start of the bankruptcy proceeding. True and correct copies of the relevant correspondence at attached hereto as Exhibit V. Yet, over a month later, Generex has not filed for bankruptcy.

34. Despite the foregoing, there is good reason to believe that Generex possesses significant assets that it has simply struggled to monetize. Some of Generex's known assets

include, but are not limited to (1) Generex's majority (90%+) stake in NuGenerex Immuno-Oncology, Inc., which independently has a market cap of nearly $50 million, and which has been valued by an expert firm as having a value of over $500 million (this valuation was provided to AEXG under a stipulation of confidentiality, but a true and correct copy of this valuation will be furnished to the Court on request for in camera inspection, or filed under seal if the Court so allows, as an "exhibit W"); and (2) a book value of investments near $168 million, presumably largely due to valuable intellectual property owned through Generex's subsidiaries. While AEXG does not vouch for the validity of these valuations, they provide prima facie evidence Generex does possess meaningful resources that could be put toward satisfying the Judgment.

**Alternate Efforts to Secure a Fiduciary Have Been Futile**

35. In light of Generex's failure to truthfully disclose information, negotiate in good faith, marshal its assets for the benefit of its creditors, and observe the restraining notice served in connection with the Judgment, AEXG considered filing an involuntary chapter 7 bankruptcy petition against Generex because the automatic stay and avoidance powers provided to a bankruptcy trustee would best protect the interests of AEXG and Generex's other creditors.

36. AEXG believes that Generex is an eligible debtor under the relevant provisions of the Bankruptcy Code, has clearly failed to pay its debts as they come due, and has demonstrated that it is either unable or unwilling to act in the best interests of its true creditors. .

37. For example, AEXG was suspicious of the Trust debt, because it was unknown to Mazars, Generex's auditor (Exhibit F). It was particularly suspicious, because during the arbitration proceeding between Generex and AEXG which resulted in the Judgment, AEXG had inquired about dividend shares being deposited into the Trust and Mr. Moscato personally benefiting from the dividend that he sought to deny AEXG from profiting off. Mr. Moscato had

denied the same under oath, and stated that the Trust had "given" the shares it had received back to Generex: "We all agreed that we would put it in trust, friends of Generex, for Generex. And the trust clearly says to be used only for Generex and they were given back. They were retired back to the Generex treasury where they belong. Where they belong." A true and correct copy of the transcript of the fifth day of the arbitration proceeding, including all of Mr. Moscato's testimony, it attached hereto as Exhibit X.

38. It appeared, and still appears, to AEXG that Mr. Moscato is re-characterizing a capital contribution he and other Generex insiders made – a return of dividend shares to the treasury – as a loan to fraudulently position himself as a material creditor and rob Generex's other creditors of recovery in any bankruptcy. This is just one example of why it is critical that a fiduciary be appointed to oversee the liquidation of Generex and its assets, including avoidance actions and possible recharacterization of debt to equity.

39. Given the large number of Generex creditors, 11 U.S.C. § 301(b)(1) requires three qualifying creditors to sign an involuntary petition to place an entity into bankruptcy. It is my understanding that AEXG would qualify as under as such a creditor, but while AEXG exercised due diligence, it proved unable to secure two partners. True and correct copies of written refusals to cooperate, and/or unanswered final requests to join the petition, are attached hereto as exhibit Y.

40. Mr. Moscato apparently emailed other creditors to advise them that AEXG was operating a "trick" to get its attorneys, whom he referred to as "ambulance chasers", "paid first." Mr. Moscato's emails to this effect apparently also repeated his claim to be owed $86 million and that he would "get all that's collected" in any bankruptcy. A true and correct copy of Mr. Moscato's email to this effect to Brooks Houghton is attached hereto as Exhibit Z.

41. While Generex repeatedly claimed it was on the verge of filing a bankruptcy, that has not manifested and in the interim, Generex has been free to squander its remaining assets and effectuated numerous avoidable fraudulent and preferential transfers. In one email sent to one of Generex's creditors, Mr. Moscato represented that Generex has not filed for bankruptcy only because it lacks the funds to do so. A true and correct copy of that email is attached hereto as exhibit AA. Yet, Mr. Moscato embarked on a campaign to prevent AEXG from starting a bankruptcy proceeding.

**Conclusion**

42. AEXG is requesting the appointment of a receiver as it is otherwise unable, for all the foregoing reasons, to obtain satisfaction of the Judgment. I attach hereto as exhibit BB a proposed order for the appointment of a receiver with broad powers sufficient to monetize Generex's remaining assets so that the Judgment may be satisfied, or, alternatively, so that Generex's creditors in general may be paid.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 5, 2021.

Dated: New York New York
November 5, 2021

_____
RICHARD ALTER